UNITED STATES DISTRICT COURT
MIDDLE DISTRICT
JACKSONVILLE DIVISION

MICHAEL G. HARRIS,

      Plaintiff,

v.                                      Case No.:3:00-cv-1297-J-12MCR

CORRECTIONS CORPORATION
OF AMERICA, et al.,

      Defendant's
_____/

## PLAINTIFF'S TRIAL BRIEF

COMES NOW Michael G. Harris (hereinafter "Harris" or "Plaintiff"), proceeding *pro se*, file this Plaintiff's Trial Brief pursuant to the Court's September 12, 2003 Order of the Middle District Court, Jacksonville Division.

## FACTS OF THE CASE

This is a Title VII, Civil Rights Act 42 USC § 2000e-17. Harris was at the time of employment with Corrections Corporation of America (hereinafter "CCA" or "Defendants"), a certified State of Florida Correctional Officer. The employer CCA doing business in Florida, contracted with the Florida Department of Corrections (hereinafter "FDOC") to house youthful offenders in Lake City, Florida. CCA hired Harris on January 6, 1997 as a correctional officer. On or about January 16 1997, Harris skipped a rank and was promoted to Assistant Shift Supervisor. Harris worked in the capacity as a Shift Supervisor until July 25, 1997 where he was then promoted to Shift supervisor.

Harris became a member CCA Lake City Correctional Facility (hereinafter "LCCF")

100% Club for not missing any days from work for two consecutive years and without using any unscheduled leave time.

On March 17, 1999, Harris was injured on the job from no fault of his own. Shortly there after Harris sought and received workers' compensation benefits (hereinafter "WC"). Immediately after Harris began receiving unwanted negative behaviors from Steve Lister (Hereinafter "S. Lister") who was at that time a shift supervisor. S. Lister would go around to the shift subordinates making negative comments about Harris. Harris made an informal complaint to the Chief of Security, Kenneth Gagne, in an attempt to alleviate the potential problem. In the meeting Lister agreed to work with Harris. S. Lister shortly thereafter continued his behavior against Harris. Warden David Eads (hereinafter "Eads") was the Warden during the incidents. And was well aware of all incidents. Eads schedule a supervisors retreat in Live Oak, Florida and teamed Lister and Harris as partners for team building exercises. S. Lister became Chief of Security of LCCF and continued his harassment of Harris. S. Lister had written Harris a problem solving notice (hereinafter "PSN') for taking a day previously approved off from work( PSN are disciplinary reports given to staff for rule violations). This was done despite the fact that Harris along fellow Shift Supervisor, Scott Everett (hereinafter "Everett") was given prior permission to take the day off when ever there were two(2) supervisors present for work that day. Everett who is a white male never received any PSN's for taking Eleven (11) known days off from work when he and I were both present.

Harris then received a PSN from Assistant Warden, Kevin Watson (hereinafter "Watson"), where Watson stated that Harris allowed inmates into a secured (confinement) area of the facility. This was a conspired act. This was further harassment from Harris

2

supervisors.

Harris then utilized CCA/LCCF grievance procedure in an attempt to rectify the PSN received from LCCF, by forwarding it to Corporate Office, Mr. Jerry Peterson (hereinafter "Peterson"), Senior Divisional Director. Peterson violated their own policies when he refuse to investigate fully and fairly and responded late to the grievance. LCCF supervisors began to retaliate against Harris after he filed his grievance. LCCF Training Manager, Barry Fain and S. Lister attempted to have Harris lose his correctional officer certification by attempting to keep Harris out of a mandatory training class when LCCF remove Harris name from the training roster. Their reasons were that they needed me for shift, "facilities needs."

CCA/LCCF advised Harris subordinate officers to not advise him of any incidents that were taken place inside the facility in order to discredit Harris supervisory authority and skills.

CCA/LCCF Watson and S. Lister began to follow Harris throughout the entire facility wherever Harris would do his security checks to harass him.

Harris had several letters written to CCA Corporate Office, Peterson, Michael J. Quinlan, and Doc Crants so that they will have actual notice of the incidents of harassment and disparate treatment at LCCf. Peterson had come to LCCF and sat down with Eads and S. Lister to resolve the problems there. Peterson assured Harris that he will not have any further problems at LCCF. Harris left the meeting feeling good about it. Peterson again answered Harris grievance late and showed where he did not conduct a full and fair investigation. Again, shortly there after the supervisors were treating Harris differently than his counterparts. On September 8, 1999, Harris filed a Complaint with the Equal Employment Opportunity Commission (hereinafter "EEOC') for the violations created by CCA/LCCF and Corporate office.

3

Harris on September 16, 1999, received another injury at the facility. Harris advised his supervisors that he would be okay once he had gotten his medicine so that he could return to work. Watson, who was acting warden at the LCCF at that time created and adverse employment action when he refused to allow Harris to return to work and placed Harris on WC status. Harris requested to work be accommodated by working other posts so that he would not have to be on WC. Watson advised Harris that he would have to see a doctor before he returned to work, and that Harris would not be able to return any time soon because the facility would be painting the entire inside. Harris presented Eight (8) doctor notes before he was able to return to work approximately six (6) months later (September 16, 1999-March 13, 2000). CCA/LCCF refused to honor the doctor notes, even though they were form their own approved doctor. CCA/LCCF refused to accommodate Harris so they could have returned Harris to employment from WC. CCA/LCCF accommodated another employee that had a similar injury to Harris's by placing her in another position so that she would not be injured further. This accommodation requested by Harris would not have caused any hardships for CCA. Eads advised Harris that he was not a correctional officer in order to not to accommodate Harris to work any other posts. Here again, CCA refused to train Harris to get his re-certification for firearm training. Eads advised Harris that he would have to go to the local college in order to receive training. CCA/LCCF was well aware that they are required by Florida Statutes to training their own correctional officers.

CCA Corporate did nothing to stop the hostile work environment created by CCA/LCCF even after actual and constructive notice. CCA Corporate became a proxy to the LCCF conduct by upholding their actions. See, Farahger v. City of Boca Raton, 524 U. S. 775 (1998). Also, see, e.g. Katz v. Dole, 709 F. 2d 251, 256 (Ca4 1983). ("Upholding employer liability

4

because the employer's supervisors personnel manifested unmistakable acuiescence in order approval of the harassment"); EEOC v. Hacienda Hotel, 881 F. 2d 1504, 1516 (CA 9. 1989) (Employer liable where hotel manager did not respond to the complaints about supervisors' harassment); Hall v. Gus Constr. Co., 842 F. 2d 1010, 1016 (CA 8 1988) (Holding employer liable for harassment of co-workers because supervisor knew of the harassment but did nothing).

    Vicariously liability is proper because the supervisor acts within the scope of his authority when he makes discriminatory decisions. See, e.g. Shager v. Upjohn Co., 913 F. 2d 398, 405 (Ca 7 1990) ("[A} supervisory employee who fires a subordinate is doing the kind of thing that he is authorized to do, and the wrongful intent with which he does it does not carry his behavior so far beyond the orbit of his responsibilities as to ex excuse the employer"). Others have suggested that vicarious liability is appropriate because the supervisor who discriminate in this manner is added by the agency relation. See, e.g. Nichols v. Franks, 42 F. 3d 503, 514 (CA 9 1994). Other courts have endorse these two theories. See, e.g. Harrison v. Eddy, Inc., 112 F. 3d 1437, 1443 (Ca 1997) cert. Pending, No. 97-232. The proxy theory is alive here. See, e.g. Kotcher v. Rosa and Sullivan Appliance Ctr., Inc., 957 F. 2d 59, 62 (CA 2 1992). "A Master is subject to liability for the torts of his servants committed while acting in the scope of their employment." See, Tabor v. Maine, 67 F. 3d 1029, 1037 (CA 2 1995) (" As the leading torts treatise has put it, ' the integrating principle' of respondeat superior is 'that the employer should be liable for those faults that may be fairly regarded as risks of his business, whether they are committed in furthering it or not") (Quoting 5 Harper, F. James & O. Gray, Law of Torts § 26.8, pp. 40-41 (2d ed. 1986). See, also 29 CFR § 1604.11 (d) (2000) (employer is liable for co-worker harassment if it "knows or should have known of the conduct, unless it can show that it took immediate and

5

appropriate corrective action"); 3 Larson & A. Larson, Employment Discrimination § 46.07 [4] [a]. P. 46-101 (2d ed. 1998). Harris sought the assistant of his supervisors and the assistance of corporate office supervisors by notifying them then filing a grievance. CCA Corporate Office did not take immediate action in resolving the matter.

While Harris was on WC, WC providers stopped providing Harris his Benefits. On December 27, 1999 Harris obtained employment with FDOC. On January 6, 2000, CCA stated that information was received about Harris employment, that initiate an investigation for WC fraud. CCA stated that they then contacted the Inspector General Office (hereinafter "IG") of the FDOC, a Mr. Mike Page and advised them of the same information. CCA stated that the IG ordered that Harris employment be terminated for reeiving the allegation for WC fraud. CCA, when providing false information committed WC fraud. Florida Statute 440.105.

On March 13, 2000, CCA permitted Harris to return to work at the LCCF Facility. Immediately upon Harris return, CCA Eads and Assistant Warden, Jaye Smith conducted a a continuing interrogation/investigation concerning Harris employment with FDOC. Harris advised Eads at that time that he could not discuss the issue because it was a WC issue. The issue was that Eads, Watson and Barry Fain was subpoenaed for the false information Harris believed CCA had provide to FDOC in order to have Harris terminated from employment with them. Due to the previously issued subpoenas form Harris WC attorney requesting a deposition of the fraud committed by CCA (Florida Statute 440.108), Harris did not want to jeopardize his attorney's depositions of Harris supervisors by participating in that investigation on March 13, 2000.

Additionally, Harris requested a copy of the interrogation tape recording of those

proceedings. Eads agreed that Harris could have a copy of the recording, but never provide Harris with a copy. Later, Harris requested his guaranteed copy of the recording and asserted his rights under Florida Statutes 112. 531-112..533, the correctional officer "bill of rights." On March 23, 2000, Eads had provide Harris with a written interrogation/investigation and ordered that Harris respond by April 4, 2000. Harris responded on March 31, 2000, in a Certified Letter, stating basically the same that "legally, I have been advised to refuse to answer any and all questions at this time." Harris had a right to refuse to participate in an investigation to protect his rights in a pending WC investigation as stated on March 13, 2000. On Friday, April 14, 2000, Harris had written a Letter to Eads, requesting among a few things a copy of the recording, to inspect his personnel files and requesting to see the WC doctor so that Harris could receive more medicine. On Monday, April 17, 2003, Harris also sought the assistance of the facility contract monitor in order to resolve some issues. The contract monitor had departed the facility, and Harris was called into Eads office and ultimately terminated from employment. Harris was retaliated for exercising his rights as a Florid a correctional officer, receiving and requesting further WC benefits and to see his personnel files.

    Harris immediately filed a grievance to Peterson, pursuant to the grievance procedures within the Seven days dictated by that policy. Peterson, by policy had Ten (10) days to respond, and again refused to fully and fairly investigate. Responding approximately 21 days later, affirming the CCA/LCCF decision.

    The facts are undisputable. Harris termination from CCA was illegal. CCA/LCCF was the employer contracted to do business in the State of Florida. Harris was the employee. Harris was discriminated, harassed and retaliated against. Harris filed Complaints with the EEOC, and

7

received WC benefits. Harris attempted to exercised his Florida correctional officer rights, and every other rights afforded to him in his terms and conditions of employment. CCA violated all of Harris rights. Of the state and federal constitutions. CCA does not have any legitimate business reasons for terminating Harris employment. Their reasons are a pretext for the discrimination, harassment and retaliation created against Harris. See, McDonnell Douglas Corp. V. Green, 411 U.S. 792, 802 (1973), where the pretext framework would remain the dominant rule in Title VII disparate treatment cases. CCA admits to the forbidden characteristics of creating a hostile work environment with racial tension.

CCA demonstrated "mixed motives" due to Harris exercising his rights afforded to him under several state and federal laws. See, Desert Palace v. Costa, 123 S. Ct. 2148 (2003). The Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), plurality explained that a mixed-motive case would exist if "a forbidden characteristic played a part in the employment decision."

CCA was well aware that Harris was engaged in protective activity when he began receiving benefits and CCA began the adverse activity against Harris up to and including the termination. CCA terminated Harris Three (3) days after Harris requested that he see his doctor and receive more medications. The termination was in close proximity with the request of receiving further benefits and other WC issues. See, Humphrey v. sears Roebuck & Co., 192 F. Supp., 2d 1371 (S.D. Fla. 2002).

CCA violated Harris procedural process rights when not adhering to Harris constitutionally protect rights as a Stat of Florida correctional officer. CCA did not advise Harris that there were any investigations initiated on January 6, 2000, for allegedly committing WC fraud. CCA Did not advise of any witness against him, nor did they give notice of their intent to

8